## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| **ARMANDO MEJIA SOLIS,** | * | |
| | * | **CIVIL NO.** |
| **Plaintiff,** | * | |
| | * | **RE: CIVIL RIGHTS** |
| **v.** | * | |
| | * | **PLAINTIFF DEMANDS** |
| **HEAVY PRODUCTS INCORPORATED** | * | **TRIAL BY JURY** |
| **and/or "JOHN DOW" d.b.a. AZTECA** | * | |
| **RESTAURANTE MEXICANO; and,** | * | |
| **INSURANCE COMPANIES "A"** | * | |
| **and "B,"** | * | |
| | * | |
| **Defendants.** | * | |

**************************************************

## COMPLAINT

**TO THE HONORABLE COURT:**

**NOW INTO THIS COURT,** through the undersigned counsel, comes the Plaintiff and respectfully states, alleges and requests, as follows:

## I. NATURE OF ACTION

1.1    The plaintiff brings this complaint against the defendant, his former employer, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. (henceforth "Title VII"), seeking compensatory damages as result of discriminatory treatment, where Defendant subjected him to a hostile work environment and terminated him from his employment by reason of his national origin (Mexican).

1.2    The plaintiff also brings this complaint against the defendant for discrimination by reason of his national origin, under the local counterpart of

Title VII, as well as for intentional infliction of emotional distress and wrongful discharge pursuant to local law.

1.3   Additionally, the plaintiff brings this complaint against the defendant for breach of contract and damages pursuant to the Puerto Rico Civil Code.

## II.  **JURISDICTION AND VENUE**

2.1 This Honorable Court has subject matter jurisdiction to allow this suit pursuant to 28 U.S.C. § 1331. This action is authorized pursuant to Sections 706(f)(1) and (3) of Title VII, as amended, 42 U.S.C. § 2000e(5).

2.2 This Honorable Court has personal jurisdiction over this civil action because the employment practices and other acts alleged to be unlawful were committed and the damages were suffered by Plaintiff within the jurisdiction of the United States District Court, District of Puerto Rico.

2.3   Pursuant to 42 U.S.C. § 1367(a), this Honorable Court has supplemental jurisdiction over the pendent claims raised herein by Plaintiff, pursuant to Law No. 100 of June 30, 1959 (29 L.P.R.A. §§ 146 *et. seq.*; henceforth "Act 100"), Law No. 80 of May 30, 1976 (29 L.P.R.A. §185a *et seq.* henceforth "Act 80"), and Articles 1044, 1054, 1059 and 1060 of the Puerto Rico Civil Code (31 P.R. Laws Ann. §§§ 2994, 3018, 3023 and 3024; henceforth collectively referred to as the "Civil Code"), since they are so related to the forestated federal claim that they all form part of the same case or controversy under Article III of the Constitution of the United States of America.

2.4    Venue lies under 28 U.S.C. § 1391(b) & (c), and 31 U.S.C. §3732(a) because Defendants transact business within this district and the facts forming the basis of this Complaint occurred within the District of Puerto Rico.

### III.   DEMAND FOR TRIAL BY JURY

3.    Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff demands a trial by jury in the instant case, pursuant to Fed. R. Civ. P. 38b.

### IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.1   On June 6, 2017, Plaintiff filed timely charges of employment discrimination with the Anti-Discrimination Unit of the Equal Employment Opportunity Commission ("EEOC").

4.2   Subsequently, Plaintiff received the notice of sue rights, dated October 15, 2018, from the EEOC.

### V.    PARTIES TO THE ACTION

5.1    The plaintiff **Armando Mejia-Solis** ("**Mejia**" or "Plaintiff") was born and grew up in the Federal District of Mexico; he is of Mexican origin, descent and nationality; he displays the physical, cultural and linguistic characteristics of said group; and, he is domiciled and a resident of Puerto Rico and a citizen of the United States of America.

5.2    At all times relevant herein, **Heavy Products Incorporated** or **"John Dow,"** which is designated with a fictitious name because its true name is unknown to Plaintiff at this time, d/b/a **Azteca Restaurante Mexicano** (henceforth collectively referred to as "**HPI**" or Defendant) was a corporation,

company or entity, which was authorized to conduct, as it conducted, business as a restaurant in the Commonwealth of Puerto Rico.

5.3    At all times relevant herein, **Mejia** was an employee of **HPI**, within the meaning of the applicable statutes, who fulfilled duties for Defendant, as Executive Chef, at its restaurant, located in Canovanas, Puerto Rico.

5.4    At all times relevant herein, **Mejia** fulfilled duties for **HPI** as Executive Chef in the Restaurant; he was duly qualified to carry out the duties assigned to him in his position; he performed his functions with a high degree of excellence, diligence and interest in his work; and, he expected to be treated in a professional and respectful manner by his employer, without the fear of being the object of discrimination or of being subjected to hostile conduct by reason of his national origin.

5.5   At all times relevant herein, **HPI** was an "employer" within the meaning of the applicable statutes, which was engaged in an industry affecting commerce and employed more than 15 and less than 100 regular employees.

5.6    At all times relevant herein, **Mejia** and **HPI** had a partnership agreement to design, develop and operate the Restaurant.

5.7    At all times relevant herein, **Enrique Mangual** ("**Mangual**") was an agent and employee of **HPI**, acting within the scope of such agency and employment, who performed managerial, administrative, and supervisory functions and fulfilled duties for Defendant as its Executive President.

5.8    At all times relevant herein, **Insurance Companies "A"** and **"B"** had issued and had in full force and effect insurance policies which covered the

respective civil responsibility of **HPI** and **"John Doe"** in claims such as the ones set forth in this Complaint.

## IV.   <u>FACTUAL ALLEGATIONS</u>

4.1    In the middle of June 2015, and while **Mejia** was the owner of the restaurant Armando's Mexican Cuisine, located at the Quality Inn Hotel, in Condado, P.R., he met **Mangual** thereat.

4.2    Shortly thereafter, on or around June 22, 2015, **Mangual** visited **Mejia** at Armando's Mexican Cuisine. During the ensuing conversation, **Mangual** told **Mejia** to sell the restaurant and extended him an offer to make him partner and to employ him in a restaurant that he was planning to develop and open soon in Canovanas. To that end, **Mangual** invited **Mejia** to meet with him the following day at his offices, located in the then existing Kikuet Factory, in Canovanas, P.R.

4.3    The next day (June 23), as **Mangual** had offered him a partnership and employment in a forthcoming venture, **Mejia** attended the meeting convened by the former at his offices in Canovanas. Once there, **Mejia** was shown the premises inside the Enrique Mangual Canovanas Mall where the Mexican restaurant would be built.

4.4    That same June 23, after **Mejia** saw the place, **Mangual** met with him and they both reached separate employment and partnership agreements in connection with the Mexican restaurant that **HPI** was planning to develop and open in the Enrique Mangual Canovanas Mall under the following terms and conditions:

A. According to the partnership agreement, **Azteca** would pay the rent of the space and the development of the restaurant in the mall, whereas **Mejia** would be in charge of its design and the preparation of the menu. Once the restaurant opened to the public, **Azteca** would defray the operational expenses. As partners, the parties would divide the net profit 50/50.

B. Under the employment agreement, **Mejia** would immediately begin to perform a series of basic tasks regarding the construction and development of the restaurant. Once the restaurant started operations, **Azteca** would employ Plaintiff as the Executive Chef of the restaurant.

4.5    A few days later, **Mejia** met with **Mangual** and negotiated a salary of $700.00 per week for Plaintiff as part of the project budget for works necessary for the construction and development of the restaurant that were not related to its design and the preparation of the menu, which he had agreed to do as a partner.

4.6    **Mejia** fully complied with his part of the partnership agreement that consisted of the functional design of the restaurant including: the location of the different areas of the restaurant (kitchen, lounge, bar, restrooms, reception, etc.); the selection and location of industrial refrigeration, stove, cooking, storage and washing equipment in the different areas of the restaurant; and, the selection of the pottery, the bar, the tables and chairs, the counters, the cauldrons, pots and pans, the crockery, cutlery, glasses, etc. He also prepared the menu.

4.7    By the end of July 2015, **Mangual** accepted the design of the restaurant prepared by **Mejia** and at that point in time his function as a designer ended.

4.8     Notwithstanding, once **Mejia** delivered the design to **Mangual** and as the development of project progressed, **Mangual**, through his daughter and wife, intruded on the design created by Plaintiff, questioning and giving opinions about the size of the bar, the layout of the room and the colors to be used, etc., thereby, changing the original design. Moreover, **Mangual**, unilaterally, decided to add Creole food to the menu of the Mexican restaurant that Plaintiff had prepared. Thus, Plaintiff was relegated from creative partner of the design of the restaurant and menu to just being partner.

4.9     Since July 1, 2015 and until the restaurant was opened to the public on December 3, 2015, daily and full time, sometimes 7 days a week, as part of the employment agreement, **Mejia** was attentive to the construction and development of the restaurant. He oversaw:

   a. the logistics of the construction and development of the different areas of the restaurant (kitchen, lounge, bar, reception, etc.);

   b. the selection of the suppliers of the industrial equipment and the coordination for its installation in the different components of the restaurant;

   c. the installation and establishment of electricity, security, air conditioning, computers and cash registers systems;

   d. the selection of suppliers of the products that would be needed for the dishes on the menu; and,

   e. the quotes with those providers and suppliers.

4.10    **Mangual** always maintained complete control over **Mejia's** work related to the construction and development of the restaurant; in addition, whenever **Mejia** made the recommendations, it was **Mangual** who always made the decisions.

4.11  Also during the restaurant pre-opening period, **Mangual** required **Mejia** to perform tasks that were not part of the employment agreement reached between the parties for the construction and development of the restaurant, such as, for example, the following:

> a. on a daily basis, **Mangual** ordered **Mejia** to cook different dishes for him and his friends;
>
> b. constantly, **Mangual** required **Mejia** to serve him as a chauffeur in latter's personal car to do the former's personal errands in any part of the metropolitan area of San Juan or in Canovanas, without reimbursing Plaintiff for gas or expenses; and,
>
> c. **Mangual** assigned **Mejia** the task of mapping and cleaning the premises.

4.12  On one occasion, before the opening of the restaurant, **Mangual** humiliated and belittled **Mejia** in the presence of other people, ordering him: "Mexican, kill all the flies that are in the room and map."

4.13  From July 1, 2015, and until Mejia stopped working for **HPI** on September 26, 2016, at all times in the workplace: **Mangual** omitted to call **Mejia** by his name and, in a disparaging and contemptuous manner, referred to him, as the "Mexican." **Mejia** expressly told him not to call him that because he considered it offensive, but **Mangual** ignored him and kept calling him "Mexican." Even, **Mangual's** daughters called Plaintiff that way, "Mexican." In addition, the insults, the devaluation, the humiliations and the abuse were part of the labor relation. **Mangual** would engaged in this behavior while addressing **Mejia** in front of his sub-alternates, clients, known persons or strangers.

4.14  Before the restaurant opened for business on December 3, 2015, **Mangual** subjected **Mejia** to the following, among others, acts of harassment by reason of his national origin.

> A. When **Mejia** furnished to **Mangual** the organizational chart of the kitchen and lounge area, as part of the design of the restaurant and according to the partnership agreement, **Mangual** told him, in a very annoying, aggressive tone and loud voice: *"You're no good at all." "You're not going to choose the staff." "You're nobody to do that task." Go away." "Shut up." "Out of my office that I have a meeting."*

> B. Before the restaurant furniture arrived at the restaurant, **Mangual** asked **Mejia** to summon all the food and beverage suppliers of the products needed for the menu and the bar; and to produce for each a file containing the corresponding quantities, prices and availability of the necessary articles. But when **Mejia** introduced the suppliers to **Mangual**, the latter would humiliate Plaintiff in their presence, by using expressions such as: *"He does not know anything. It is a new project for me, I need you to enlighten me."* On each occasion, **Mangual** instructed **Mejia** to deliver the corresponding file to him and to leave his office, disparaging him by uttering remarks such as: *"Let's see, look at you Mexican. Go, get out of the office and wait for us outside. "*

4.15  One week before the restaurant opened to the public, **Mangual** took several employees out of their regular jobs from some of **HPI's** different stores dedicated to retail sale and placed them in the kitchen of the restaurant. **Mejia** was not allowed to select or opine on the employees who would perform the specific and specialized tasks in the kitchen.

4.16  Eventually, **Mejia** had to teach and train the kitchen employees in food handling, from the most basic tasks (knife handling, types of cuts needed, personal hygiene and cleaning of kitchen areas, etc.) to the most complex ones (handling raw foods, vegetables, cooking menu, silvering, conservation of food, etc.).

4.17  On December 3, 2015, the restaurant, under the name of AZTECA RESTAURANTE MEXICANO (henceforth "AZTECA Restaurant"), opened its doors to the public and began its operations.

4.18  On that day (December 3), **Mejia** started to work for **HPI**, exclusively and full time, as Executive Chef of AZTECA Restaurant, for an indefinite period of time and without a written contract, under the direct supervision of **Mangual**. Plaintiff's work schedule was from Wednesday to Sunday, from 9:00 a.m., and until the restaurant closed, at 10:00 p.m. or 11:00 p.m. -- that is, 11 to 12 hours a day.

4.19  Once **Mejia** started working for **HPI** as Executive Chef of the AZTECA Restaurant, his tasks were not limited to cooking or directing the kitchen, but included any other task or errand that **Mangual** ordered. Among others, Plaintiff had to work as his personal driver, just as he had done from July 1 to December 3, 2015. **Mangual** would also order **Mejia** to go out and buy food for the restaurant on his personal bus. On one occasion, he even gave Plaintiff the task of acting as a doorman.

4.20  After AZTECA Restaurant began to generate income from its operations as a restaurant, on several occasions, **Mejia** demanded **Mangual** the percentage of the net profits corresponding to his participation as a partner (50%). On each occasion, **Mangual** would respond to him, in a mocking, sarcastic tone and laughing in his face: "I never said that." Plaintiff would then reiterate the day, time and place where they had entered into that covenant. When he felt cornered, **Mangual** would throw **Mejia** out of his

office, saying to him in an aggressive and angry way: "Go away, go away. I do not want to hear you anymore. OKAY? We'll talk later, I have a meeting."

4.21   From December 3, 2015, to September 26, 2016, while **Mejia** was in charge of the kitchen of AZTECA Restaurant, as its Executive Chef, it was common for **Mangual** to insult, disparage, embarrass or humiliate him in front of the clientele or his sub-alternates, and to discriminate in other ways because of his national origin. Some of these incidents are listed below:

A. **Mangual**, as set forth above, continuously referred to **Mejia**, humiliatingly and contemptuously, as the "Mexican" or "Mexicanito."

B. On one occasion, a customer called **Mejia** at his table to congratulate him for the excellent food. **Mangual** approached them and, in front of the client, said out loud to Plaintiff: *"You served him a lot of salad. Since it does not cost you, right, Mexican. Go to the kitchen."* Minutes later the client went to the kitchen, apologized for the incident and told Plaintiff: *"You must not endure that behavior of that animal. Thanks for the food, but I'm not coming back [to this place]. See you later".*

C. Once, **Mangual** ordered **Mejia** to buy 150 pork legs, because that was going to be his gift to all his employees. He kept his word to all employees because they received their pork legs, except Plaintiff.

D. Another time, **Mangual** called **Mejia** at his table in the restaurant and asked him to make him a halibut burrito to take to his doctor. Next to him was the pianist who played on Sundays in the restaurant. When Plaintiff returned to the table to deliver the burrito, he told **Mangual**: *"Boss tell the doctor to put [the burrito] in the microwave for 1 minute and ready."* To which he replied: *"Leave it there and go to hell."* The pianist said to him, *"but Quique, what's wrong?"* **Mangual** then repeated to Plaintiff: *"Go to hell, I told you."* Embarrassed and scared, Plaintiff asked him: *"But boss, what's wrong? Why do you treat me like that?"* And, he reiterated: "Go away, go to the kitchen. Go!"

E. On Father's Day of 2015, while the restaurant was full to capacity, **Mangual** left the bathroom with the back of his pants covered all over with his own excrement, went to the lounge and stopped at the bar. **Mejia** told the Manager (**Carlos Santiago**) to return **Mangual** to the bathroom and get him cleaned up, but he answered: *"No, not me."* And he left. Next, **Mejia** informed **Mangual** that he was all dirty with excrement. **Mangual** then ordered him, *"well clean me;"* and, Plaintiff had to do so.

F. In mid-September 2016, **Mangual** entered the kitchen and indicated the date on which each employee would go on vacation. He explained that, *"Everyone should take vacations before the Christmas period arrives because in December no one should be missing."* He pointed directly at **Mejia** and, in a tone of annoyance, told him: *"You have no right to vacation because I pay you for professional services."* This was used as a pretext to discriminate against Plaintiff because, as explained hereinabove, he worked there as Defendant's employee. **Mejia** immediately went to **Mangual's** office to clarify the matter but, as usual, he did not want to receive him. Later, **Mangual** returned to the kitchen area and told **Mejia**: *"You will not receive any bonus, because you are for professional services."* And, so it was; Defendant deprived Plaintiff of his employee rights to vacations and Christmas bonus.

G. Repeatedly, **Mangual**, in a humiliating way, would tell **Mejia**: *"You have no authority here." "Here I am the one that rules, and what I say is done."*

H. **Mangual** did not allow **Mejia** to leave the kitchen, let alone be in the lounge. Plaintiff had to take his rest time outside the premises of the restaurant.

4.22  By September 2016, **Mejia** was so tired and fed up with so many insults (*"you are good for nothing," "you do not know how to do that," "Mexican,"* etc.) and humiliations (*"shut up", "you do not know anything", "go to the kitchen,"* etc.), in presence of other employees and even clients, and disparaging remarks about his work performance, that he decided he was going to start leaving work earlier (9:30 p.m. to 10:00 p.m.) and would work a maximum of 12 hours a day.

4.23  Around that point in time, **Mejia** would go to work unmotivated and with the anguish and discomfort of not knowing what treatment he would receive that day from **Mangual**. The constant hostile work environment made him feel humiliated, devalued, disillusioned, sad and hopeless. He could not leave that abusive and hostile work environment because he needed the salary. He had worked to be a partner but had become less than an employee, without any type of right or privilege. He felt used, scammed and cheated. Inclusively, **Mangual** changed the ingredients of his recipes, without even consulting him who was the Chef that created them. For all the foregoing reasons, **Mejia** decided to speak with **Mangual** to ask him to stop the discrimination and mistreatment or he would be forced to give up his job in the restaurant. However, as explained below, Plaintiff could never talk to him.

4.24  On September 26, 2016 (Monday), **Mejia** arrived at the offices of **Mangual**, in Canóvanas, to collect his paycheck for $930.00, as he usually did, and to talk to him. **Hector Vargas**, Comptroller of all of **Mangual's** businesses, was in the reception area, in the company of **Mangual's** eldest daughter, **Magaly Mangual**, and the secretary of the company. **Vargas** told **Mejia**: *"Mexican, Pai [referring to **Mangual**] is not here. Are you going to wait?"* Plaintiff answered that he would stay in the office and wait for **Mangual** to receive his paycheck and talk to him.

4.25  At that moment, **Magaly Mangual** told **Mejia**, in a scolding tone, *"Mexican, these 2 bags of chips are the ones left over from the previous day*

*(Sunday), and that, you know well, is loss, and I'm not on the lookout."* **Mejia** replied to her: *"look my cool queen, first I'll tell you that I do everything in the restaurant. I even make the chips, but as your dad says, and you know it, I do not have any authority in the kitchen. He always says that I'm nobody to order, recommend, opine or say something. Is it true, right?"* She responded with a gesture and said, *"It's true."* Then he said to her, *"look we can go to your office and talk, Hector can accompany us, because I did not come to be scolded, I'm tired and I cannot take it anymore."*

4.26   Once in the office, **Mejia** told **Magaly Mangual** and **Héctor Vargas**: *"I am going to speak with my heart and with all the decency and respect and I want you to listen to me because one cannot talk with your father."* They both listened to him and heard his story about the mistreatment and discrimination of which he was being target in the restaurant. Finally, **Mejia** told **Magaly Mangual**, *"Tomorrow, I'm going to talk to your dad about these things."* Then he left the office.

4.27   While **Mejia** was on his way to his home in Carolina, his cell phone rang and it was **Mangual** who was calling him. When Plaintiff answered, **Mangual** told him: *"I do not need you anymore, do not come back tomorrow, do not come back OK, may it go well for you and God bless you,"* and he hung up the phone.

4.28   The motivating factor underlying for **HPI's** decision to terminate **Mejia's** employment was retaliation for having complained of discrimination against Mexican individuals.

14

# V. <u>Causes of Action</u>

**First Cause of Action:**

5.1    Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

5.2    This First Cause of Action arises under Title VII.

5.3    **HPI** unlawfully discriminated against **Mejia** with respect to his terms, conditions and privileges of employment because of his national origin, in violation of Title VII.

5.4    As direct result of **HPI's** aforementioned unlawful employment practices, **Mejia** suffered, is suffering and will continue to suffer severe mental and emotional pain, anguish and distress; and he has sustained a loss of happiness and a loss of the capacity to enjoy life and professional endeavors. Plaintiff is entitled to receive a just and fair compensation for these damages.

5.5    **HPI** engaged in the unlawful employment practices in question with malice or reckless indifference to the federally protected rights of **Mejia.** Consequently, Plaintiff is entitled to receive an award for punitive or exemplary damages, which will serve as punishment and deterrence for such unlawful employment practices.

5.6    Pursuant to Title VII, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C.S. § 1920, Plaintiff is entitled to be awarded the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE, Mejia** demands that Judgment be entered in his favor and against **HPI** granting him: the amount of **FIFTY THOUSAND DOLLARS ($50,000.00)** in compensatory and punitive damages; a reasonable amount for attorneys' fees, the costs of this action, and post-judgment interests; and, such other further relief that under the circumstances may seem appropriate to this Honorable Court.

**Second Cause of Action:**

5.7   Plaintiff repeats and reasserts by reference each and every allegation contained in the preceding paragraphs and incorporates the same herein as though fully set forth.

5.8   This Second Cause of Action arises under Title VII.

5.9   **HPI** unlawfully discharged **Mejia** from his employment in retaliation for having complained of discrimination by reason of national origin, in violation of Title VII.

5.10   **HPI** unlawfully discriminated against **Mejia** with respect to his terms, conditions and privileges of employment because of his national origin, in violation of Title VII.

5.11   As direct result of **HPI's** aforementioned unlawful employment practices, **Mejia** suffered, is suffering and will continue to suffer severe mental and emotional pain, anguish and distress; and he has sustained a loss of happiness and a loss of the capacity to enjoy life and professional endeavors. Plaintiff is entitled to receive a just and fair compensation for these damages.

5.12  **HPI** engaged in the unlawful employment practices in question with malice or reckless indifference to the federally protected rights of **Mejia.** Consequently, Plaintiff is entitled to receive an award for punitive or exemplary damages, which will serve as punishment and deterrence for such unlawful employment practices.

5.13  Defendant's unlawful discharge of Plaintiff caused him to sustain a loss of earnings and employment benefits. Accordingly, Defendant is liable to Plaintiff for the loss of past and future pay and benefits caused by its violation of Title VII.

5.14  Pursuant to Title VII, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C.S. § 1920, Plaintiff is entitled to be awarded the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE, Mejia** demands that Judgment be entered in his favor and against **HPI** granting him: the amount of **FIFTY THOUSAND DOLLARS ($50,000.00)** in compensatory and punitive damages; an award for back and future pay and loss of employment benefits; a reasonable amount for attorneys' fees, the costs of this action, and post-judgment interests; and, such other further relief that under the circumstances may seem appropriate to this Honorable Court.

**Third Cause of Action:**

5.15  Plaintiff repeats and reasserts by reference each and every allegation contained in the preceding paragraphs and incorporates the same herein as though fully set forth.

5.16   This Third Cause of Action arises under Act 100.

5.17   **HPI** unlawfully discharged **Mejia** from his employment and otherwise discriminated against him with respect to the terms, conditions and privileges of his employment because of his national origin, in violation of Act 100.

5.18   As direct result of **HPI's** aforementioned unlawful employment practices, **Mejia** suffered, is suffering and will continue to suffer severe mental and emotional pain, anguish and distress; and he has sustained a loss of happiness and a loss of the capacity to enjoy life and professional endeavors. Plaintiff is entitled to receive a just and fair compensation for these damages which, pursuant to Act 100, consists in the twofold amount of the actual damages suffered by him.

5.19   Defendant's unlawful discharge of Plaintiff caused him to sustain a loss of earnings and employment benefits**.** Accordingly, Defendant is liable to Plaintiff for the loss of past and future pay and benefits caused by its violation of Title VII which, pursuant to Act 100, consists in the twofold amount of the actual loss sustained by him.

5.20   Pursuant to Act 100 and Rule 44 of the Puerto Rico Rules of Civil Procedure, Plaintiff is entitled to be awarded the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE, Mejia** demands that Judgment be entered in his favor and against **HPI**: granting him the amount of THREE MILLION DOLLARS ($1,000,000.00) for mental damages and doubling such amount for a total of

**TWO MILLION DOLLARS ($2,000,000.00)**; awarding him back and future pay and loss of employment benefits and doubling such amount; granting him a reasonable amount for attorneys' fees, the costs of this action, and post-judgment interests; and, awarding him such other further relief that under the circumstances may seem appropriate to this Honorable Court.

**Fourth Cause of Action:**

5.21  Plaintiff repeats and reasserts by reference each and every allegation contained in the preceding paragraphs and incorporates the same herein as though fully set forth.

5.22  This Fourth Cause of Action arises under Act 80.

5.23  **HPI** discharged **Mejia** from his employment without just cause, in violation of Act 80. Consequently, Plaintiff is entitled to receive from Defendant statutory severance pay.

5.24  Pursuant to Act 80, Federal Rule 54(d)(1) of Civil Procedure and 28 U.S.C.S. §1920, Plaintiff is entitled to be awarded the costs to be incurred in this suit, plus reasonable attorney's fees.

**THEREFORE, Mejia** demands that Judgment be entered in his favor and against **HPI**: granting him statutory severance pay; awarding him reasonable attorneys' fees, the costs of this action, and pre-judgment and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

**Fifth Cause of Action:**

5.25  Plaintiff repeats and reasserts by reference each and every allegation contained in the preceding paragraphs and incorporates the same herein as though fully set forth.

5.26  This Fifth Cause of Action arises under the Civil Code.

5.27  As a direct result of **HPI'S** breach of the partnership agreement it reached with **Mejia** on June 22, 2015, he has failed to obtain profits from December 2015 to December 2018, reasonably estimated in the amount of **$240,000.00**.

5.28  **HPI'S** fraudulently acted in contravention of the partnership agreement and is also liable to Mejia for the mental damages that clearly originated from the nonfulfillment of its obligations, which are reasonably estimated in the amount of **$100,000.00**

5.29  Since **HPI** has obstinately and temerariously denied responsibility for the damages and losses claimed herein, pursuant the provisions of Rule 44 of the Rules of Civil Procedure of the Commonwealth of Puerto Rico, **Mejia** is also be entitled to an award of pre-judgment and post- judgment interest, to be computed from the amount finally adjudged to him, plus costs and a reasonable amount for attorneys' fees.

**THEREFORE**, **Mejia** demands that Judgment be entered in its favor and against **HPI**: granting Plaintiff compensation for his losses and damages, which are reasonably estimated at this time in the amount of **THREE HUNDRED FORTY THOUSAND DOLLARS ($340,000.00)**; granting him pre-judgment and

post-judgment interests; awarding him a reasonable amount for attorneys' fees, plus the costs of this action; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## VI.  **PRAYER FOR RELIEF**

**WHEREFORE,** it is respectfully requested that Judgment be entered by this Honorable Court in favor of Plaintiff and against Defendants:

a.      granting Plaintiff all the sums and remedies requested in the complaint;

b.   imposing upon Defendants the payment of all costs and expenses to be incurred in this lawsuit;

c.      awarding Plaintiff pre-judgment and post-judgment interests, plus a reasonable amount for attorneys' fees; and,

d.      granting Plaintiff any other relief that she may be entitled to as a matter of law.

**RESPECTFULLY SUBMITTED.** In San Juan, Puerto Rico, this 27th day of December, 2018.

*S/ José F. Quetglas Jordán*
USDC-PR #203411

**QUETGLAS LAW FIRM, P.S.C.**
1353, Luis Vigoreaux Ave.
PMB 657
Guaynabo, PR 00966
Tel:(787) 406-8915
Email: jfquetglas@gmail.com;
quetglaslawpsc@gmail.com